# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STEVEN J. VILLEGAS,<br><br>                Appellant,<br><br>v.<br><br>NATIONSTAR MORTGAGE, LLC;<br>AURORA BANK, FSB; NORTHWEST<br>TRUSTEE SERVICES, INC.; U.S.<br>BANK, N.A. as Trustee for Lehman<br>Mortgage Trust Mortgage Pass-Through<br>Certificates, Series 2007-2,<br><br>                Respondent. | No. 77163-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br><br><br>FILED: March 11, 2019 |

LEACH, J. — Steven Villegas appeals the summary judgment dismissal of his claims against Nationstar Mortgage LLC, Aurora Bank FSB, Northwest Trustee Services Inc. (NWTS), and U.S. Bank N.A. for violations of the Consumer Protection Act (CPA).[1] Villegas also appeals the trial court's findings of fact and conclusions of law entered in favor of Nationstar on two remaining CPA claims dismissed after a bench trial. We affirm.

---

[1] Ch. 19.86 RCW.

FACTS

In 2006, Americahomekey Inc. loaned Villegas $552,000 to refinance his home. Villegas signed a promissory note. It states that if he did "not pay the full amount of each monthly payment on the date that it is due," he would be in default. Americahomekey endorsed the note to Lehman Brothers Bank FSB. It later endorsed the note to Lehman Brothers Holdings Inc., which in turn endorsed the note in blank.[2]

Villegas also signed a deed of trust pledging his home as security for the note. The deed of trust identified Americahomekey as the lender, Talon Group as the trustee, and Mortgage Electronic Registration Systems Inc. (MERS) as "nominee for Lender and Lender's successors and assigns" as the beneficiary.

In February 2007, Lehman Brothers sold Villegas's note to a securitized trust called Lehman Mortgage Trust Mortgage Pass-Through Certificates Series 2007-2. A custodial agreement for the Trust established Aurora Loan Services LLC as the loan servicer and U.S. Bank as the custodian in possession of loan documents, including the original notes. The custodial agreement provided that the custodian would release any loan documents to the servicer upon request. Aurora Loan Services sent Villegas a letter telling him that it was the new loan servicer. Aurora Loan Services later notified Villegas that it had transferred the servicing rights to its parent company, Aurora Bank.

---

[2] The record does not contain the dates of the endorsements.

Undisputed evidence shows that Villegas stopped making note payments in January 2012.

On June 9, 2012, Aurora Bank instructed NWTS to start a nonjudicial foreclosure of Villegas's home. On June 25, 2012, Aurora Bank furnished NWTS with a beneficiary declaration. It stated that Aurora was the holder of the note. The beneficiary declaration, signed by Regina Lashley, states,

> DECLARATION OF BENEFICIARY
> PURSUANT TO RCW 61.24.030
> (SB 5810)
>
> Date: APRIL 4, 2012
>
> Loan Number: 5227
>
> Borrower Name: STEVEN J. VILLEGAS
>
> . . . .
>
> I am employed as Senior Vice President for Aurora Bank FSB. I am duly authorized to make this declaration on behalf of Aurora Bank FSB.
>
> Aurora Bank FSB is the holder of the Promissory Note evidencing the above-referenced loan.
>
> I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

On June 12, 2012, Nationstar acquired the servicing rights to Villegas's loan from Aurora. This included the right to obtain the original note from U.S. Bank, the document custodian. Aurora sent Villegas a letter informing him that Nationstar would become his loan servicer effective July 1, 2012.

On June 28, 2012, NWTS, acting as "duly authorized agent" for Aurora Bank, posted a notice of default at Villegas's home.

On July 4, 2012, Nationstar instructed NWTS to proceed with the nonjudicial foreclosure as agent for Nationstar. On July 23, 2013, Nationstar signed an appointment of NWTS as successor trustee.

On August 24, 2012, NWTS scheduled a trustee's sale of Villegas's home for November 30, 2012.

In September 2012, Villegas requested mediation under the Foreclosure Fairness Act (FFA).[3] Nationstar placed the foreclosure of Villegas's home on hold.

On December 13, 2012, Villegas, his attorney, and a representative from Nationstar met with the mediator. The parties discussed a loan modification. Nationstar analyzed Villegas's financial information and determined that he qualified for a federal Home Affordable Mortgage Program loan modification.

On May 20, 2013, Nationstar sent Villegas a trial payment plan (TPP) offer.[4] The TPP required that Villegas make three monthly payments of $3,117.86. Nationstar also identified an "escrow shortage" of $112.29. This required an additional monthly payment of $9.36.

---

[3] Ch. 61.24 RCW.

[4] The record shows that Nationstar sent Villegas a prior TPP offer on February 8, 2013. Villegas contended that he never received the first offer. The trial court found Villegas's testimony credible.

-4-

Villegas satisfied the requirements of the TPP. On September 23, 2013, Nationstar sent Villegas a permanent loan modification offer. Nationstar recalculated the monthly payment to $2,471.85. But Nationstar also now identified an escrow shortage of $3,918.96. Nationstar told Villegas that the new monthly escrow payment would be $866.44, bringing his total monthly payment to $3,358.29. Villegas asked for an explanation for the much higher escrow amount. Nationstar did not provide one. Villegas did not accept the offer.

On January 13, 2014, the mediator closed the mediation process. He issued a certificate finding that Nationstar had not negotiated in good faith:

> The payment amount on the final modification ($3,358.29) was significantly higher than the trial payments ($3,117.86). The initial idea that the discrepancy would be explained by escrow analysis was incorrect. Attorneys for the beneficiary made great effort to escalate the matter with Nationstar and get an explanation for the increase. None has been forthcoming. I would be willing to consider amending the certification if the loan amount agreed to by the parties in mediation is honored.

On June 10, 2015, Nationstar sued Villegas, seeking to judicially foreclose the deed of trust. Villegas asserted counterclaims against Nationstar and crossclaims against Aurora Bank, NWTS, and U.S. Bank for violations of the CPA and intentional and negligent misrepresentation.[5] For his CPA claims, Villegas alleged that (1) Aurora Bank, Nationstar, and NWTS started nonjudicial foreclosure proceedings in violation of the deeds of trust act (DTA)[6] and (2)

---

[5] Villegas abandoned the intentional and negligent misrepresentation claims at summary judgment.
[6] Ch. 61.24 RCW.

Nationstar failed to adequately review him for a loan modification or provide accurate information about the loan modification terms.

In October 2015, Villegas sold his home. After he paid the note in full, Nationstar voluntarily dismissed its complaint. The trial court then realigned the parties, designating Villegas as the plaintiff and Nationstar, Aurora Bank, NWTS, and U.S. Bank as the defendants.

The defendants jointly moved for summary judgment. The defendants relied on the declaration of Lashunda Carter, assistant secretary of Nationstar. It stated that Nationstar took physical possession of the note from U.S. Bank on May 16, 2013. Carter attached to her declaration copies of several documents showing the physical transfer of the note to Nationstar. The defendants also relied on the declaration of Tim Gaynor, vice-president of NWTS. Gaynor stated that NWTS initiated nonjudicial foreclosure proceedings at Aurora Bank's request. In doing so, Gaynor stated, NWTS relied on a beneficiary declaration identifying Aurora Bank as the holder of the note. Gaynor stated that after Nationstar assumed Aurora Bank's servicing obligations, Nationstar instructed NWTS to proceed with the foreclosure as Nationstar's agent.

On November 10, 2016, the trial court granted summary judgment dismissal of all of Villegas's claims except for "a per se violation of the Consumer Protection Act as it relates to a 'bad faith' certification against Nationstar resulting from statutory mediation." Nationstar filed a second motion for summary judgment to dismiss the remaining CPA claims. The trial court denied this

motion, ruling that "the public interest element of the CPA claim is per se satisfied due to a bad faith certification based upon RCW 61.24.163 and RCW 19.86.093."

The CPA claims against Nationstar involving mediation proceeded to a bench trial on May 3, 2017. Villegas contended that Nationstar violated the CPA by (1) failing to send a representative with the requisite settlement authority to participate in the mediation and (2) failing to adequately explain the calculations in the permanent loan modification offer.

The trial court considered the testimony of Villegas and Justin Laubscher, a senior default case specialist and Nationstar's corporate representative. The trial court also reviewed 41 exhibits and the CR 30(b)(6) deposition testimony of Aaryn Richardson, a litigation resolution analyst for Nationstar. Following four days of evidence and argument, the trial court issued 14 pages of findings of fact and conclusions of law. On Villegas's first claim, the trial court found that Nationstar "presented undisputed evidence that the individual who was assigned to participate in the mediation had the authority to settle with Villegas." On Villegas's second claim, the trial court agreed that Nationstar failed to mediate in good faith:

> The Court finds that Nationstar failed to mediate in good faith in that it failed to provide documentation requested by the mediator to explain how it had computed the escrow shortage in the permanent loan modification offer provided in September 2013. Nationstar conceded that the mediator and Villegas requested this information and that it did not provide an answer to the question raised. Nationstar's escrow shortage computations differed significantly in the February 2013 and May 2013 TPP offers, in the May 2013 escrow statement, and in the September 2013 permanent loan modification. Any reasonable borrower would have been perplexed

by these different calculations. Seeking clarification from Nationstar was reasonable; Nationstar's inability or refusal to answer the question was not. For this reason, the Court finds Nationstar violated RCW 61.24.163(10)(b) during the mediation with Villegas.

Under RCW 61.24.135, this violation constitutes an unfair or deceptive act or practice occurring in trade or commerce.

But the trial court also found that Villegas did not prove that Nationstar's violation of RCW 61.24.163 caused him any compensable damages. So the trial court entered a judgment in favor of Nationstar.

Villegas asked the trial court to reconsider its decision. The trial court denied this request, explaining,

> First, there was no evidence presented that the $4,000 Mr. Villegas incurred for mediation could have been avoided had Nationstar explained how it had computed the escrow amounts set out in the loan modification offer. Mr. Villegas would have incurred those expenses whether or not the parties had entered into a loan modification agreement. Thus, the Court does not find the evidence sufficient to find he incurred these mediation expenses as a result of Nationstar's bad faith.

> Second, this Court does not find sufficient evidence from which to find on a more probable than not basis that Mr. Villegas would have accepted an offer that had been fully explained to him. Had the past arrears in escrow payments been folded into a new loan balance, the new payment amount would have been much more in line with the first TPP offer extended to Mr. Villegas. That offer would have been monthly payments of $3,117.86 plus the escrow shortage of $139.02 a month, making his total payment around $3,256.88. The total monthly payment Nationstar requested in the permanent loan offer was $3,358.29, just $101 more a month than what the loan payment probably should have been. Yet, Mr. Villegas refused this offer—not only because he was unclear about the alleged escrow shortage—but also because he could not afford even this payment. Based on the evidence presented at trial, the Court reaffirms Mr. Villegas's failure to establish that Nationstar's bad faith caused him any injury.

Villegas appeals.

DISCUSSION

Washington's CPA provides that "[a]ny person who is injured in his or her business or property" by a violation of the act may bring a civil suit for injunctive relief, duplicative attorney fees and costs, and treble damages.[7] To succeed on a CPA claim, a plaintiff must show "(1) an unfair or deceptive act (2) in trade or commerce (3) that affects the public interest, (4) injury to the plaintiff in his or her business or property, and (5) a causal link between the unfair or deceptive act complained of and the injury suffered."[8] The plaintiff must establish all five elements to prevail.[9] A plaintiff may bring a claim under the CPA for violation of the DTA. We review whether a particular action constitutes a CPA violation as a question of law.[10]

1.    Claims Dismissed on Summary Judgment

We review an order granting summary judgment de novo, considering all facts and reasonable inferences in the light most favorable to the nonmoving party.[11] Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[12]

---

[7] RCW 19.86.090.
[8] Trujillo v. Nw. Tr. Servs., Inc., 183 Wn.2d 820, 834, 355 P.3d 1100 (2015).
[9] Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc., 162 Wn.2d 59, 74, 170 P.3d 10 (2007).
[10] Leingang v. Pierce County Med. Bureau, Inc., 131 Wn.2d 133, 150, 930 P.2d 288 (1997).
[11] Lybbert v. Grant County, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000).
[12] Lybbert, 141 Wn.2d at 34; CR 56(c).

Mere allegations or conclusory statements of fact unsupported by evidence are not sufficient to establish a genuine issue of fact.[13]

First, Villegas claims that neither Aurora Bank nor Nationstar were the holders of the note. So neither had authority to direct the foreclosure or appoint NWTS as the trustee.

The DTA defines a "beneficiary" as the "holder of the instrument or document evidencing the obligations secured by the deed of trust."[14] Only a lawful beneficiary has the power to appoint a successor to the original trustee named in the deed of trust.[15] Only a properly appointed trustee may proceed with a nonjudicial foreclosure of real property.[16] Thus, if an unlawful beneficiary appoints a successor trustee, that trustee lacks legal authority to carry out the foreclosure.[17]

A holder is a "person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession."[18] Possession may be either actual or constructive.[19] The holder of

---

[13] CR 56(e); Baldwin v. Sisters of Providence in Wash., Inc., 112 Wn.2d 127, 132, 769 P.2d 298 (1989).

[14] RCW 61.24.005(2).

[15] Bavand v. OneWest Bank, FSB, 176 Wn. App. 475, 486, 309 P.3d 636 (2013).

[16] Bavand, 176 Wn. App. at 486-87.

[17] Walker v. Quality Loan Serv. Corp., 176 Wn. App. 294, 306, 308 P.3d 716 (2013).

[18] RCW 62A.1-201(21)(A).

[19] See RCW 62A.3-201 U.C.C. cmt. 1, at 307 (a holder may possess a note "directly or through an agent"); Gleeson v. Lichty, 62 Wash. 656, 659, 114 P. 518 (1911) ("But, if we assume that the note was not in [the defendant's] actual possession, it was clearly under his control, and therefore constructively in his possession.").

a note is the party entitled to enforce it.[20] The holder of the note is not necessarily the owner, and a holder does not need to own a note to enforce the note.[21]

Here, the record shows that both Aurora Bank and Nationstar were the holders of the note at the time that each directed NWTS to proceed with the nonjudicial foreclosure. As the servicer of Villegas's loan, both Aurora Bank and Nationstar had constructive possession of the note because they had the authority to request it from the document custodian at any time. And Nationstar had the note in its physical possession since May 16, 2013. Because the note was endorsed in blank and Nationstar had actual physical possession of the note, it was the holder of the note with the right to enforce it. The trial court properly dismissed Villegas's claims involving the identity of the beneficiary.[22]

Next, Villegas contends that NWTS violated its duty of good faith under RCW 61.24.010(4) and duty to comply with RCW 61.24.030(7)(a) because it did not adequately ascertain whether Aurora and Nationstar were the holders of the note.

"RCW 61.24.010(4) imposes a duty of good faith on the trustee toward the borrower, beneficiary, and grantor."[23] A trustee must "'adequately inform' itself"

---

[20] RCW 62A.3-301.

[21] Brown v. Dep't of Commerce, 184 Wn.2d 509, 525, 359 P.3d 771 (2015).

[22] At trial on the mediation claim, the trial court found that "[i]n July 2012, Nationstar became the servicer on this loan and became the holder of the promissory note." Villegas does not challenge this finding.

[23] Lyons v. U.S. Bank Nat'l Ass'n, 181 Wn.2d 775, 787, 336 P.3d 1142 (2014).

about "the purported beneficiary's right to foreclose, including, at a minimum, a 'cursory investigation' to adhere to its duty of good faith."[24] A trustee's failure to act impartially between note holders and borrowers can support a claim for damages under the CPA.[25]

RCW 61.24.030(7)(a) requires that "for residential real property, before the notice of trustee's sale is recorded, transmitted, or served, the trustee shall have proof that the beneficiary is the holder of any promissory note or other obligation secured by the deed of trust." "A declaration by the beneficiary made under the penalty of perjury stating that the beneficiary is the holder of any promissory note or other obligation secured by the deed of trust" satisfies a trustee's obligations under RCW 61.24.030(7)(a).[26] But a trustee may determine the identity of the note holder "in a way other than through the beneficiary declaration."[27]

Aurora provided NWTS a beneficiary declaration made under penalty of perjury. It unambiguously stated that Aurora was the holder of Villegas's note. NWTS relied on this declaration before initiating the nonjudicial foreclosure process. Thus, Villegas fails to raise a genuine dispute of material fact that NWTS violated its statutory obligations with regard to Aurora.

---

[24] Lyons, 181 Wn.2d at 787 (internal quotation marks omitted) (quoting Walker, 176 Wn. App. at 309).

[25] Lyons, 181 Wn.2d at 787.

[26] RCW 61.24.030(7)(a); see also Brown, 184 Wn.2d at 514 ("a party's undisputed declaration submitted under penalty of perjury that the party is the holder of the note satisfies the DTA's proof of beneficiary provisions").

[27] Lyons, 181 Wn.2d at 791.

NWTS did not receive a beneficiary declaration for Nationstar.[28] But NWTS had other proof that Nationstar had become the new holder of the note. First, NWTS received a notification through a secure messaging platform on June 28, 2012, that Nationstar had assumed Aurora's loan servicing obligations. And on July 4, 2012, Nationstar sent NWTS instructions to proceed with the foreclosure with Nationstar, not Aurora, as the beneficiary. In his declaration, Gaynor stated,

> Based on NWTS's experience in the non-judicial foreclosure industry, loan servicers typically advise NWTS when a change in the foreclosing beneficiary occurs. At no time after being informed to proceed with foreclosure in the name of Nationstar did NWTS receive information stating that Nationstar was not the foreclosing beneficiary.

Finally, NWTS knew that the county auditor had recorded an assignment of the deed of trust on July 25, 2012, showing Nationstar as the beneficiary. The record establishes that NWTS satisfied its obligations under RCW 61.24.030(7)(a) regarding the foreclosing beneficiary's identity. Villegas fails to raise a genuine issue of material fact that NWTS violated its statutory duties under the DTA.

---

[28] The record on appeal contains a beneficiary declaration by Nationstar that references the wrong borrower's name and property address. It is unclear how, if at all, the declaration is relevant to Villegas's case. The declaration was filed several months after the notice of appeal. Because the declaration was not before the trial court and Villegas did not file a motion to supplement the record pursuant to RAP 9.11, we do not consider it further.

## 2.    Villegas's Claims at Trial

An appellate court limits its review of challenges of a trial court's findings of fact and conclusions of law "to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment."[29]  Substantial evidence exists "'when there is a sufficient quantum of proof to support the trial court's findings of fact.'"[30] An appellate court accepts unchallenged findings of fact as true on appeal.[31]

Villegas challenges the trial court's finding that Nationstar did not violate RCW 61.24.163(10) by failing to send a representative with settlement authority to the mediation.  But uncontroverted evidence supports the trial court's finding. Laubscher testified that "[e]very default case specialist that attends an FFA mediation also has full settlement authority."  Laubscher explained that "full settlement authority" includes "the authority to grant a foreclosure alternative option," including a loan modification.  Villegas speculates that Nationstar's representative did not have settlement authority because "[i]f that person had had any authority or knowledge of the file, he could have provided an explanation regarding the change in monthly payment amounts."  But the representative's inability to adequately explain the loan modification calculations does not prove that the representative lacked settlement authority.

---

[29] Dickson v. Kates, 132 Wn. App. 724, 730, 133 P.3d 498 (2006) (citing Org. to Pres. Agric. Lands v. Adams County, 128 Wn.2d 869, 882, 913 P.2d 793 (1996)).

[30] Dickson, 132 Wn. App. at 730 (quoting Org. to Pres. Agric. Lands, 128 Wn.2d at 882).

[31] Dickson, 132 Wn. App. at 730.

Villegas also challenges the trial court's finding and conclusion that he did not prove the injury element of a CPA claim. The CPA limits compensable injuries to "'injury to [the] plaintiff in his or her business or property.'"[32] A claimant must show that the alleged injury would not have occurred "but for" the defendant's unlawful acts.[33] "Because the CPA addresses 'injuries' rather than 'damages,' quantifiable monetary loss is not required."[34] "Where a more favorable loan modification would have been granted but for bad faith in mediation, the borrower may have suffered an injury to property within the meaning of the CPA."[35] And expenses incurred in extra mediation sessions necessitated by an opposing party's failure to prepare or mediate in good faith can be a compensable injury under the CPA.[36]

At trial, Villegas and Nationstar stipulated that Villegas incurred $350 for an initial attorney consultation after receiving the notice of trustee's sale and that he paid $4,000 in legal fees in connection with the mediation.[37] But Nationstar's lack of good faith arose only after it offered Villegas a permanent loan

---

[32] Frias v. Asset Foreclosure Servs., Inc., 181 Wn.2d 412, 430, 334 P.3d 529 (2014) (alteration in original) (quoting Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 780, 719 P.2d 531 (1986)).

[33] Schnall v. AT&T Wireless Servs., Inc., 171 Wn.2d 260, 278, 259 P.3d 129 (2011) (quoting Indoor Billboard, 162 Wn.2d at 83-84).

[34] Frias, 181 Wn.2d at 431 (citing Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 57, 204 P.3d 885 (2009)).

[35] Frias, 181 Wn.2d at 431-32.

[36] Frias, 181 Wn.2d at 432.

[37] On appeal, Villegas contends that he actually paid $400 in mediation fees. Villegas fails to support this assertion with any citation to the record. In any event, the fees for mediation were not caused by Nationstar's subsequent inability to explain how it calculated the escrow shortage in Villegas's permanent loan modification offer.

modification in September 2013. Villegas did not present any evidence that Nationstar's conduct after September 2013 caused him to incur any of his expenses. Substantial evidence supports the trial court's finding that Villegas did not prove a compensable injury. This finding supports the trial court's conclusion of law.

Villegas argues, as he did below, that he incurred injuries by paying attorney fees for "representing him in the mediation that ended up being a waste." But, as the trial court correctly reasoned, Villegas would have paid these fees to have an attorney represent him at the mediation no matter what happened at it.

Villegas argues that the trial court should have found that damage to his credit score constituted an injury under the CPA. But Villegas did not present any evidence of a causal link between Nationstar's bad faith and the alleged damage to his credit score. And Villegas testified that he did not know what his credit score was, either before he defaulted on the loan or after mediation.

Finally, citing Frias, Villegas argues that a mediation conducted in bad faith, "irrespective of any out of pocket money damages, constituted an 'injury' under the CPA." But Frias held only that bad faith in mediation may result in injuries, and pleading this misconduct was sufficient to survive a CR 12(b)(6) motion to dismiss.[38] Villegas cites no authority in support of the proposition that a bad faith finding per se satisfies the CPA's injury requirement.

---

[38] Frias, 181 Wn.2d at 431-32.

Affirmed.

_____
Leach, J.

WE CONCUR:

_____

_____
Dwyer, J.